IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        No. 3:11-CR-123
                                     )
RICHARD ERNEST HUEBNER,              )        (PHILLIPS/SHIRLEY)
                                     )
            Defendant.               )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court on the Defendant's Motion to Suppress

Evidence and Memorandum in Support [Doc. 9], filed on October 20, 2011. The Government

responded [Doc. 10] in opposition to the motion on November 4, 2011. The Court held an

evidentiary hearing on November 28, 2011. Assistant United States Attorney Cynthia F. Davidson

represented the Government. Attorney Jonathan A. Moffatt appeared on behalf of the Defendant,

who was not present. The Government presented the testimony of Sevierville City Police

Department Officer William Shawn Crawford and Patrol Officer Jason Ballard. The parties also

presented oral argument on the issues. At the conclusion of the hearing, the Court granted the

Defendant's request for leave to file a post-hearing brief. The Defendant filed his post-hearing brief

[Doc. 17] on December 20, 2011. The Government filed its responsive post-hearing brief [Doc. 20]

on January 4, 2012, with the Defendant filing a reply brief [Doc. 21] on January 11, 2012. The

Court took the motion, response, testimony, post-hearing briefs, and oral arguments under

advisement.

# I. POSITIONS OF THE PARTIES

The Defendant is charged in a single-count Indictment [Doc. 1] with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), on or about May 10, 2011. The Defendant argues that any evidence discovered and statements he allegedly made should be suppressed because he was illegally seized when he was arrested without probable cause. Alternatively, the Defendant argues that if the Court determines that the encounter involving the Defendant and the officers was an investigative detention, the officers did not have reasonable suspicion to detain him. The Defendant also contends that the Government did not provide adequate proof that he was properly advised of his Miranda rights prior to having made an allegedly inculpatory statement.

The Government responds that the stop and detention of the Defendant was supported by reasonable suspicion and that the statements made by the Defendant were voluntarily made and not in response to a custodial interrogation. It further asserts that any statements made by the Defendant prior to the administration of Miranda warnings fall within the "public safety" exception and are thus properly obtained and admissible.

# II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

### (A) Testimony of Officer William Shawn Crawford

The Government called Officer Shawn Crawford, who testified that he works as a patrol officer for the Sevierville City Police Department. Officer Crawford responded to a 911 dispatch

call of "shots fired" at 10:10 p.m., on May 10, 2011, with Officer Dave Fahidy.[1] The officers responded to 647 Hawk Hollow Drive in Sevierville, Tennessee. When they arrived, they parked approximately a quarter to a half mile away for safety reasons and walked to speak with speak with the complainant, who called 911. The complainant stated that "they had been shooting outside all evening" a couple of trailers away from her trailer [Doc. 14 at 7].

After speaking with the complainant, the officers walked in the direction of the residence to which the complainant pointed. As the officers walked toward the trailer, they heard gunshots and took cover behind an automobile parked in the driveway while they called for back up. Officer Crawford testified that the shots came from the backyard area between the Defendant's trailer and his neighbor's trailer. At the point during which the officers crouched behind the vehicle in a driveway, Officer Crawford did not know that one of the two trailers belonged to the Defendant. The officers waited until backup arrived and after some time, the Defendant "come out from behind the trailer calling for his cat" [Doc. 14 at 8]. Officer Crawford then described: "At that time we ordered him on the ground. He was detained, taken into custody" [Doc. 14 at 8]. The Defendant was laying on the ground and was handcuffed by Officer Fahidy. Officer Crawford testified that he did not read the Defendant his Miranda rights at that time but stated that he heard Officer Ballard reading the Defendant his rights as Officer Crawford walked away. It is against the law to shoot a gun within the city limits of Sevierville.

Officer Crawford then left the spot where the Defendant was on the ground because the Defendant made a statement to the effect that there had been someone named "Mike" with him.

---

[1]Officer Crawford testified that Officer Fahidy is no longer employed with the Sevierville City Police Department and that his departure was a personal decision.

3

Officer Crawford went looking for Mike and searched for approximately twenty to thirty minutes without finding him. At the end of the search for Mike, Officer Fahidy called out that he found a rifle and he walked up from behind the trailer. The rifle was not loaded, and no other officers saw where Officer Fahidy found the firearm. Officer Fahidy stated that the gun was "from behind the trailer" [Doc. 14 at 10]. Officer Crawford then stood up the Defendant and informed him that he was under arrest. Officer Crawford testified that he read the Defendant his rights at that point and charged him with reckless endangerment and possession of a firearm by a convicted felon. Officer Crawford stated at the hearing that he knew the Defendant was a convicted felon because he ran a criminal history check on him, but he did not testify as to when he performed this check.

On cross-examination, Officer Crawford testified that he and Officer Fahidy were the first officers to arrive at Hawk Hollow and that he did not personally hear the "shots fired" call to dispatch. Officer Crawford testified that they arrived at the scene approximately one to two minutes after they received the call from dispatch. Officer Crawford recalled that the complainant's trailer was three to four trailers down from the Defendant's trailer, but he did not remember the complainant's name or address. Officer Crawford clarified that he and Officer Fahidy were in the Defendant's driveway while they crouched behind a car and waited for backup, and he testified that it took the backup officers approximately five or six minutes to arrive after called. Officers Crawford and Fahidy were both armed with AR-15 semiautomatic rifles while they waited behind the car in the driveway. Responding to the call for backup, Officer Ballard and Officer Maddron arrived at different points in separate cars.

Officer Crawford testified that the complainant did not in any way describe the person she thought might be shooting guns and did not give any names. The complainant stated only that she

4

believed the gunfire was coming from several trailers away from her trailer. Officer Crawford testified that the officers were waiting behind the car in the driveway because the situation was frightening because they heard gunshots.

Officer Crawford testified that when the Defendant was walking in between the trailers and Officer Crawford first saw him, the Defendant was walking toward the front door of his own trailer and did not have a firearm in his possession. Prior to the Defendant making it to his front door, Officers Crawford and Fahidy ordered him to get down on the ground and to show his hands. The officers yelled at the Defendant to get on the ground immediately upon his entry into the front yard. Officer Crawford testified that the Defendant was not free to leave when he was on the ground in handcuffs. Officer Crawford also testified that he is sure that the officers asked the Defendant where the gun was but that he does not remember at what point they asked him. Officer Crawford stated that he did not personally ask where the gun was but that the Defendant stated that he had been with Mike. When Officer Crawford asked where Mike was, the Defendant stated that he did not know. After questioning the Defendant about Mike, Officers Crawford and Fahidy went to the neighbor's trailer and banged on the doors, but no one answered. Officer Crawford testified that the officers never went back to the neighbor's trailer because they did not have probable cause to search the trailer.

Officer Crawford never asked the Defendant to sign a <u>Miranda</u> rights waiver form and did not attempt to record any statement made by the Defendant. The officers never performed any physical tests on the firearm recovered and never attempted to find Mike at a later date. Officer Crawford reiterated on cross-examination that he heard Officer Ballard reading the Defendant his <u>Miranda</u> rights after the Defendant was handcuffed and on the ground, as he walked away to go look

for Mike. He also admitted that the Defendant had already made some statements about Mike having been with him when Officer Ballard administered the <u>Miranda</u> warnings, but he could not recall if the statements about Mike were made in response to any questioning by the officers.

Officer Crawford testified that there is no audio or video of the interaction between the Defendant and the officers because the police cruisers were parked too far away from the trailer.

(B) Testimony of Officer Jason Ballard

Officer Jason Ballard is also a patrol officer with the Sevierville City Police Department, and he responded to the "shots fired" call on May 10, 2011, as well. Officer Ballard testified that he went to the scene because a "shots fired" call is serious and that he was en route to the scene as backup when the other officers said they had heard additional shots. Officer Ballard parked his car behind Officer Crawford's and walked to the driveway where Officers Crawford and Fahidy were positioned. When Officer Ballard arrived, approximately five minutes after he was called to report as backup, the other two officers were standing behind the vehicles in the driveway and had their weapons drawn.

Officer Ballard never personally heard any shots fired. The Defendant walked from behind the trailer toward the officers calling for a cat while the officers were discussing the situation. Officer Ballard testified that the Defendant was ordered to the ground immediately and that Officer Fahidy placed handcuffs on him. Officer Ballard stayed with the Defendant for approximately twenty minutes, and Officers Crawford and Fahidy looked around the area surrounding the trailer to determine if others were present. Officer Ballard testified that he read the Defendant his <u>Miranda</u> rights and that the Defendant verbally acknowledged that he understood his rights. The Defendant then asked Officer Ballard what was happening and the officer explained that the police had received

6

a "shots fired" call and were investigating it. Officer Ballard testified that the Defendant responded, stating, "'We were just shooting into the bank behind the trailer'" [Doc. 14 at 39]. The Defendant stated that he was shooting with his neighbor, Mike, and that the shooting "'wasn't a big deal'" [Doc. 14 at 40]. Officer Ballard testified that the Defendant also informed him that he is a felon and described the circumstances surrounding his drug conviction in Missouri. Officer Ballard made no report or recording of his conversation with the Defendant because Officer Crawford was the arresting officer, and the Sevierville Police Department policy is that the arresting officer completes the report.

On cross-examination, Officer Ballard admitted that he never asked the Defendant to sign a Miranda rights waiver form or to write out his statement, despite having done so in some other cases. Officer Ballard did not hear or see anything going on behind the trailers prior to seeing the Defendant walking up in between the trailers. Officer Ballard was armed with a handgun on the night in question, and he stated that the officers' firearms were pointed at the Defendant as he was directed to the ground but not after the Defendant was on the ground. Officer Ballard admitted that responding to a "shots fired" call is a dangerous moment and that it is important for officers to determine the location of the gun and who was firing.

Officer Ballard testified that the Defendant had not yet "said anything about Mike" at the time when Officers Crawford and Fahidy went searching [Doc. 14 at 44]. While Officer Ballard stated that it was possible that the Defendant had said something to the other officers that he did not hear, he testified that he was close in proximity to the Defendant and the other officers and that he does not recall the Defendant making a statement to Officer Crawford. Officer Ballard testified that he did not know whether Officer Crawford was specifically searching for Mike or not when he and

Officer Fahidy left Officer Ballard and the Defendant. Officer Ballard further testified that the Defendant was in custody when he informed him of his rights and that Officers Crawford and Fahidy were not present when the Defendant was read his rights. Officer Ballard testified that he does not carry a rights waiver form or a card listing the rights of a Defendant with him.

The Defendant did not have a firearm in his hands when Officer Ballard first saw him, and Officer Ballard had no knowledge related to the complainant or her residence.

## III. FINDINGS OF FACT

The Court finds the following facts to be relevant in addressing the issues presented: Officers Crawford and Fahidy responded to a "shots fired" call made to dispatch, at 10:10 p.m., on May 10, 2011. It is unlawful for an unauthorized person to discharge a firearm within the Sevierville city limits.[2] Officers Crawford and Fahidy spoke with the 911 caller upon arriving near the scene, and she pointed toward the direction of a trailer a few down from her trailer, from where she believed that the gun shots were fired. As Officers Crawford and Fahidy arrived in the vicinity of the trailers indicated by the complainant, they heard additional shots fired, took cover, and called for backup.

After Officer Ballard and another officer arrived, and while the officers assessed the situation, the Defendant walked toward the front yard in between two trailers, calling for his cat. At the time the officers first saw the Defendant, they were not aware of his identity or that he lived

---

[2]Officer Crawford testified that it is against the law to fire a gun anywhere within the city limits. The Court notes that the Sevierville Municipal Code Title 11, Chapter 5, Section 11-503 provides: "It shall be unlawful for any person to carry in any manner whatever, with the intent to go armed, any razor, dirk, knife, blackjack, brass knucks, pistol, revolver, or any other dangerous weapon or instrument. It shall also be unlawful for any unauthorized person to discharge a firearm within the municipality."

8

in one of the two trailers he walked between. The officers immediately ordered the Defendant to the ground, and Officer Fahidy handcuffed him. Officers Fahidy and Crawford left the Defendant to search for others[3] in the vicinity. The Defendant was in custody and was not free to leave after he was handcuffed on the ground. After the Defendant was handcuffed, Officer Ballard read the Defendant his <u>Miranda</u> rights, and the Defendant acknowledged his rights. Officer Ballard and the Defendant discussed the situation, and the Defendant informed Officer Ballard that he had been shooting behind the trailer and that he was a convicted felon. Officer Ballard and the Defendant remained together and spoke for approximately twenty to thirty minutes, during which Officer Fahidy found an unloaded gun somewhere behind the trailers. After the gun was discovered, Officer Crawford, aware that the Defendant was a previously convicted felon,[4] informed the Defendant that he was under arrest for reckless endangerment and being a felon in possession of a firearm, and again read the Defendant his <u>Miranda</u> rights.

## IV. ANALYSIS

In his motion [Doc. 9], the Defendant argues that he was improperly seized in violation of his Fourth Amendment rights when the law enforcement officers lacked probable cause to detain the him. The Defendant further contends that his Fifth Amendment rights were violated when he

---

[3]Despite the somewhat vague testimony of the two officers at the hearing with regard to when the Defendant first mentioned "Mike," the testimony of both officers is consistent with a finding that Officers Fahidy and Crawford were searching for some other person in the area, be it Mike or not, and the Court makes such a finding at this time.

[4]Officer Crawford testified that he knew the Defendant was a previously convicted felon because he conducted a background check prior to the Defendant's formal arrest. Officer Ballard testified that the Defendant told him that he was a convicted felon and described the circumstances surrounding his felony.

was questioned prior to being made aware of his <u>Miranda</u> rights. The Government responds [Doc. 10] that the officers had probable cause to detain the Defendant and that any statements made by the Defendant were made voluntarily and not as part of a custodial interrogation. In the Defendant's post-hearing brief [Doc. 17], he refines his argument to include that if the Court finds that the Defendant was not arrested when he was ordered to the ground and handcuffed by the officers, then the encounter was an improper investigative detention under <u>Terry</u> because the officers lacked reasonable suspicion to detain the Defendant. The Government argues [Doc. 20] that the officers did have reasonable suspicion to stop and detain the Defendant and that any statements made prior to the administration of <u>Miranda</u> warnings are covered within the "public safety" exception to <u>Miranda</u>.

*(A) Seizure*

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Not every contact between a police officer and a member of the public is a seizure. <u>United States v. Winfrey</u>, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

<u>United States v. Pearce</u>, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. <u>United States v. Collis</u>, 766 F.2d 219,

221 (6th Cir.), cert. denied, 474 U.S. 851 (1985).  Nor is there any Fourth Amendment implication before a defendant is stopped or searched.  United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).

The Court will first consider at what point during the incident the Fourth Amendment was implicated.  Next, it will analyze whether the police had reasonable suspicion or probable cause to seize the Defendant at that point.

*(1) Timing of Seizure*

The test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave.  Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990).   As noted above, "[a]bsent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled," an officer's request for identification or information is not a seizure.  Collis, 766 F.2d at 221 (holding that officer's request that defendant accompany him to the baggage claim area to retrieve a driver's license was not a seizure).   The Supreme Court has enumerated certain factors that can indicate a seizure:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980); Smith 594 F.3d at 536.

In this case, the Court finds that the Defendant was seized when he was ordered to the ground and handcuffed by the officers.  When the Defendant made his way toward the front yard in between his and another trailer, four armed officers, at least two of which carried semi-automatic

11

weapons, pointed guns at him and ordered him to the ground. Both Officer Crawford and Officer Ballard testified that the Defendant was not free to leave once they ordered him to the ground and Officer Fahidy placed handcuffs on him. Accordingly, the Court has no hesitation in finding that the Defendant was seized, and the Fourth Amendment was implicated, when the Defendant was ordered to the ground next to his trailer and handcuffed.

The Court must next determine whether the seizure of the Defendant was a permissible one: whether the officers had either reasonable suspicion or probable cause to detain the Defendant, and whether the Defendant was the subject of an investigatory detention or was under arrest at the moment he was seized.

*(2) Reasonable Suspicion*

The Defendant argues that at the time he was seized, the officers lacked both probable cause to arrest him and reasonable suspicion to conduct an investigatory stop. The Government contends that the officers properly conducted an investigatory detention of the Defendant based upon the specific and articulable facts they possessed at the time. "Assessing whether an investigatory stop comported with the Fourth Amendment is a two step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. Id. The Court will first determine whether the officers had reasonable suspicion to conduct an investigatory stop of the Defendant, and will then turn to whether the encounter exceeded the bounds of an

investigatory stop and was actually an arrest, as the Defendant argues.

A police officer may briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397. The Court assesses the reasonableness of the officer's suspicion in light of the totality of the circumstances surrounding the stop. See United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274.

The Government summarizes the totality of the circumstances supporting a finding that the officers had reasonable suspicion as follows:

> (1) an identifiable 911 call of shots fired; (2) it is illegal for firearms to be fired anywhere inside the city limits of Sevierville; (3) it was 10:10 p.m.; (4) the officers interviewed the 911 complainant and were shown where the shots were coming from; (5) upon arriving outside the defendant's trailer, the officers observed shots being fired from behind the trailer; (6) the defendant walked from behind his trailer where the shots had been fired; (7) the officers did not notice anyone else in the area.

13

[Doc. 20 at 4].    The Court finds that the Government has correctly identified the circumstances providing the officers with reasonable suspicion to briefly detain the Defendant for investigatory purposes.  While the Defendant argues that his mere presence in the area is insufficient in light of the other circumstances to give reasonable suspicion particular to him, the fact that the Defendant walked out from the specific area from where the officers heard the shots fired, within minutes of their having heard the shots, after 10:00 p.m., with no other individuals around, considered with the totality of the circumstances shows that the Defendant's mere presence was not what provided the reasonable suspicion.

### (i) 911 Call

Officers Crawford and Fahidy received a radio dispatch of a 911 call shots fired on Hawk Hollow Drive.  The Government argues that the 911 call was made by a citizen who was an eyewitness to the reported events and who provided her address to the police dispatcher.  Accordingly, and in light of the caller's close time and space proximity to the events described, the Government contends that the Court should find the tip reliable.  [Doc. 20 (citing Henness v. Bagley, 644 F.3d 308, 318 (6th Cir. 2011) (other citation omitted)].  In his reply to the Government's responsive post-hearing brief, the Defendant responds that the 911 caller was not an eyewitness because she claimed to have heard shots fired and pointed to the direction from where she thought they came, but gave no physical description of a subject and did not claim to have seen any illegal activities occur and did not specify the "exact" location.

Whether the dispatch of the 911 call can provide reasonable suspicion to stop the defendant turns in part upon the call's reliability.  Our Supreme Court has recognized a distinction between a report from a known citizen eyewitness and an anonymous tip.  "[I]f an unquestionably honest

14

citizen comes forward with a report of criminal activity–which if fabricated would subject him to criminal liability–we have found rigorous scrutiny of the basis of his knowledge unnecessary." Illinois v. Gates, 462 U.S. 213, 233-34 (1983) (citing Adams v. Williams, 407 U.S.143, 146-47 (1972)); see also United States v. Long, 464 F.3d 569, 573 (6th Cir. 2006) (affirming the reliability of a 911 call in which the caller gave his address and the police arrived at his residence shortly after the call), cert. denied, 549 U.S. 1240 (2007). On the other hand, an anonymous tip that a person of a certain description has committed a crime is insufficient by itself to provide reasonable suspicion to stop the person described. Florida v. J.L., 529 U.S. 266, 270-71 (2000); see United States v. Patterson, 340 F.3d 368, 371 (6th Cir. 2003). This is true because nothing is known about the anonymous informant's reliability and the tip gives no "predictive" information about the subject's future criminal activities that the officer can attempt to corroborate. J.L., 529 U.S. at 270; Patterson, 340 F.3d at 371 (observing that the reliability of an anonymous tip flows from its ability to predict future actions).

In the present case, although the officers did not specifically testify that the 911 caller identified herself, Officer Crawford testified that he and Officer Fahidy went straight to the caller's house when they arrived on Hawk Hollow. Officer Crawford further testified that the officers received additional information from the caller, that she did not know who was shooting the guns she heard but that the shooting was coming from a few trailers down from her's, and that she pointed the officers to the general direction of the shots. Accordingly, although the caller did not herself see the individuals shooting guns and did not provide descriptions of them, the Court finds that her tip was reliable. The caller was not anonymous as she gave her address for the officers to be able to question her further, she confirmed what she reported to dispatch when she spoke with Officer

Crawford, and she described what she directly heard. Moreover, the caller's reliability is not solely predicated on her having seen the Defendant shooting a gun. The additional shots heard by the officers upon arriving in the immediate area surrounding the trailers pointed out by the caller further lead to the conclusion that her initial call was reliable.

The Court's finding that the 911 call was sufficiently reliable to give rise to reasonable suspicion of criminal activity afoot in the area, specifically discharging firearms within the city limits of Sevierville, does not mean that the call alone provided reasonable suspicion to stop the Defendant, when she gave no physical description or name of the alleged perpetrator. Although the tip did assist in identifying the Defendant to the extent that it pointed the officers toward the general area around his home, the tip was more reliable "in its assertion of illegality," rather than "in its tendency to identify a determinate person." See J.L., 529 U.S. at 272. Moreover, with regard to the lack of physical description of the Defendant, even if this had been an anonymous call, which the Court does not find, the Court does not "simply dismiss the anonymous call altogether where, as here, other suspicious circumstances also existed." Caruthers, 458 F.3d at 465. To the extent that the call communicated an "'assertion of illegality,'" it along with "other factors, could provide the officers with reasonable suspicion." Smith, 594 F.3d at 540. Accordingly, the 911 call contributed to the totality of the circumstances supporting the officers' reasonable suspicion to stop the Defendant.

*(ii) Corroborating Circumstances*

The Defendant argues that his mere presence in an area where criminal conduct occurred is insufficient for a Terry stop. He contends that his presence in the general vicinity to which the complainant pointed, alone, does not provide the necessary suspicion of wrongdoing particularized

to him, to permit an investigatory detention. The Government responds that Officer Crawford had identified and interviewed a known complainant, the individual who made the 911 call. The complainant then indicated the direction of the shots to Officer Crawford. Once Officers Crawford and Fahidy arrived in that vicinity, they personally heard additional shots fired from the area behind the Defendant's trailer, corroborating the information obtained from the complainant. The Government additionally points out that the Defendant walked from behind his trailer close in time to when the officers personally heard the shots and that no other individuals were seen in the area.

In examining the totality of the circumstances in the present case, the Court finds that at the time the officers directed the Defendant to the ground in the yard of his trailer and handcuffed him, they had reasonable suspicion to believe that the Defendant was involved in criminal activity, specifically the shooting of guns that led to the "shots fired" call. The circumstances supporting this finding are (1) the 911 call of "shots fired," (2) the information gained from interviewing the complainant at the scene, and (3) the additional shots heard as corroborative evidence by Officers Crawford and Fahidy when they arrived at the scene. The late hour, the darkness, and the lack of presence of others in the immediate vicinity of the shots heard by the officers additionally contribute to the Court's finding that the officers had reasonable suspicion to briefly detain the Defendant.

In sum, the Court finds that the officers had sufficiently particularized and articulable suspicion that criminal activity, specifically discharging firearms in the city of Sevierville, had occurred and that the Defendant, who walked in close time from where the shots were fired late at night, had committed the crime, to conduct a brief investigative detention to obtain further information about the possible criminal activity.

*(3) Degree of Intrusion*

The second part of a reasonable suspicion analysis is whether the "'degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" Caruthers, 458 F.3d at 464 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993)); Smith, 594 F.3d at 537 (quoting Caruthers). The Defendant contends that he was arrested, rather than the subject of an investigatory stop, when he was "placed on the ground, head down, with guns pointed at him and was handcuffed." [Doc. 21 at 3]. The Defendant argues that this arrest was effected without probable cause and points out that the probable cause standard is higher than that of reasonable suspicion. The Defendant contends that "[t]here is no proof that any investigation occurred before [the Defendant's] arrest." [Doc. 21 at 3].

When the circumstances of an investigatory detention reveal that the officer's safety is at risk, the Sixth Circuit has permitted greater intrusion into the detainee's personal freedom as a part of an investigatory detention. See United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as a part of the Terry stop based upon tip that the occupants were armed). Specifically, handcuffing a suspect does not "exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999) (upholding handcuffing of suspects believed to have been involved in a shooting); see also United States v. Atchley, 474 F.3d 840, 849 (6th Cir. 2007) (determining that officer's handcuffing of defendant during investigatory detention was appropriate as a "safety precaution" when officers were investigating tip of methamphetamine laboratory,

18

defendant lied to officers, and defendant was nervous and evasive); United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001) (approving handcuffing of defendant at the inception of a Terry stop when the officers reasonably suspected defendant was carrying drugs and believed he might be armed due to their experience with drug traffickers); United States v. Hurst, 228 F.3d 751, 758, n.3 (6th Cir. 2000) (noting that "under the circumstances, where defendant was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous, the officers' attempt to use handcuffs as a precautionary measure to secure their safety was not unreasonable or otherwise improper).[5]  Although each of these cases turn on their individual facts, in each of them, the officers had reason to believe the person being handcuffed posed a danger to the officers.

As in many of the cases above, this case involved a report of activity involving shooting a firearm.  When Officers Crawford and Fahidy first arrived to the area in front of the Defendant's trailer, they heard additional shots fired.  The Defendant walked forward within minutes of the firing of those shots, and he walked from the area where the shots appeared to have been fired.  No evidence before the Court suggests that at the point when they were behind the vehicle in the

---

[5]The Court notes that the Sixth Circuit has also affirmed the use of handcuffs as a part of a Terry stop in several unpublished cases.  United States v. Boyette, 295 Fed. Appx. 781, 785-86 (6th Cir. 2008) (determining that approaching car at gunpoint, handcuffing defendant and occupants, and detaining them in the police car was reasonably related to circumstances in which officers knew defendant to go armed and had information that he had a weapon in his car); United States v. Powell, 2000 WL 357262 (6th Cir. Mar. 29, 2000) (holding that handcuffing the defendant before conducting a frisk, which revealed the presence of a gun and drugs, was permissible as a part of a Terry stop due to officer's reasonable suspicion that the defendant was an armed carjacker); United States v. Monhollen, 1998 WL 152934 (6th Cir. Mar. 24, 1998) (holding handcuffing of defendant to be permissible as part of Terry stop when officer received a dispatch of a shooting and knew defendant had an extensive criminal history); United States v. Walker, 1995 WL 141343 (6th Cir. Mar. 31, 1995) (holding that officers reasonably handcuffed the defendant as a part of the Terry stop because the defendants tried to evade the officers and the officers suspected the defendants were armed based upon their past experience with drug traffickers).

driveway the officers knew what specific activity was involved in the shooting of the gun(s). While there is no indication that the officers believed that the Defendant was armed when he first walked into the front yard area, they heard gun shots shortly before that moment and could not see what or who else was in the backyard from where they were positioned. Additionally, neither officer remembered or could testify as to what the Defendant was wearing on the night of May 10, 2011, and the Court notes the officers likely could not definitively determine whether or not the Defendant was armed when he walked up in the dark. Both Officer Crawford and Officer Ballard testifying that it was a tense and frightening moment while they waited in the driveway area and discussed the situation. Accordingly, the Court finds that handcuffing the Defendant in this case did not exceed the bounds of a Terry stop, because "the circumstances warrant[ed] that precaution." See Houston, 174 F.3d at 815.

Moreover, Officer Crawford testified at the hearing that the 911 caller stated that "they" were shooting guns when he and Officer Fahidy interviewed her. Because the officers did not know if they were looking for one or more persons when they arrived at the scene, it was reasonable under the circumstances to detain the Defendant and leave him with one or two officers so that the other officers were free to sweep and investigate the surrounding area to determine if further threats remained. Given the close time proximity of the gunshots heard by the officers, it was likewise reasonable under the circumstances for the officers to have guns drawn when the Defendant came forward from the backyard. See Caruthers, 458 F.3d at 464.

As to the Defendant's argument that he was arrested rather than the subject of an investigatory detention when he was seized, "[t]he general rule is that 'a police confinement which . . . goes beyond the limited restraint of a Terry investigatory stop may be constitutionally justified

only by probable cause.'" Richardson, 949 F.2d 851, 858 (6th Cir. 1991) (quoting Royer, 460 U.S. at 496). The Court does not find that the Terry stop effectuated by the officers when they seized the Defendant by ordering him to the ground and handcuffing him went beyond the scope of an investigative stop. Thus the officers did not need probable cause to detain the Defendant prior to the moment when Officer Fahidy found the firearm behind the trailer, and Officer Crawford formally placed the Defendant under arrest.

In this case, the Defendant does not specifically challenge the length of the detention, butthe length is one relevant factor in determining if a Terry stop went beyond the permissible scope. With regard to the length of the detention, "an officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions." Martin, 289 F.3d at 396. In United States v. Sharpe, 470 U.S. 675 (1985), the Supreme Court refused to establish a per se rule as to the permissible duration of an investigatory stop. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Martin, 289 F.3d at 397. In discussing the evaluation of the length of a Terry stop, the Supreme Court in Sharpe stated that one important fact to examine is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." 470 U.S. at 686. The Court finds that this consideration is particularly relevant to this case when determining whether the initial encounter between the Defendant and the officers was a permissible Terry stop or an arrest. In this case, Officers Crawford and Fahidy continued to diligently search the surrounding area, including attempting to locate and question the Defendant's neighbor, and apparently searched the area behind the trailer to locate the weapon. The sum of this

investigation took place during the twenty to thirty minutes, according to testimony, while the Defendant remained secure with Officer Ballard. Based on the circumstances of the case, and the knowledge available to the officers at the time, it was reasonable and necessary for the officers' safety to detain the Defendant while they continued their quick and diligent investigation of the surrounding area and attempted to determine whether others were present.

Based on the facts known to the officers at the time of the stop, the Court finds that their drawn weapons and the use of handcuffs were both reasonably necessary to protect the safety of the officers during the investigation, which included both questioning the Defendant and searching the surrounding area. Accordingly, those precautions were "reasonably related" to the investigation that initially warranted the stop of the Defendant and did not exceed the permissible scope of the <u>Terry</u> stop.

The Court recommends that the District Court find that the encounter on the night May 10, 2011, was a constitutionally permissible investigative detention until the point at which Officer Fahidy discovered the firearm and Officer Crawford placed him under arrest.

### (B) Statements

The Fifth Amendment to the United States Constitution protects against a defendant being "compelled in any criminal case to be a witness against himself." U.S. Const. amend IV. In light of this protection, the Supreme Court of the United States has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966); <u>see</u> <u>also</u> <u>United States v. Salvo</u>, 133 F.3d 943, 948 (6th Cir. 1998). Thus, before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his

statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning. Miranda, 384 U.S. at 479. "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

As an initial matter, the Court rejects the Defendant's contention that any statements that he made during his encounter with the police on May 10, 2011, must be suppressed as the fruit of an illegal seizure. The Court has already found that the Defendant's seizure did not violate the Fourth Amendment. Accordingly, the statements that the Defendant made on that day were not the product of an illegal seizure.

The Defendant also argues that the Government has not met its "'heavy burden'" of proving the Defendant's voluntary waiver of his Miranda rights before he made his first inculpatory statement and that any statements made must be suppressed as a result [Doc. 17 at 19]. Even when the Miranda warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those Miranda rights before it may introduce an incriminating statement by a defendant. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168. The Defendant claims that the conflicting and unclear testimony of the officers at the hearing, with regard to what was said at which points by both the officers and the Defendant during the incident in question, shows that the Government cannot prove that the Defendant voluntarily waived his Miranda rights prior to making his first inculpatory statement.

The Government argues that the Defendant was not subject to a custodial interrogation, and

also that any statements made prior to the administration of <u>Miranda</u> warnings fall within the "public safety" exception established by <u>New York v. Quarles</u>, 467 U.S. 649, 656 (1984). In support of this argument, the Government points out that the officers heard shots fired in the immediate area and contends that the officers knew there was a high probability that a firearm was in the Defendant's reach. The Government cites <u>United States v. Talley</u> wherein the Government contends that the Sixth Circuit held that officers were justified in asking the defendant where the gun was after the defendant was secured but before <u>Miranda</u> warnings were issued. <u>See</u> 275 F.3d 560, 562-64 (6th Cir. 2001).

In response to the Government's "public safety" argument, the Defendant discusses counsel for the Government's representation at the hearing that the statements at issue in this motion are "what Officer Ballard testified to today." [Doc. 21 (citing Hearing Transcript at 62)]. The Defendant contends that this response by counsel for the Government leads to the conclusion that the only statements at issue are those made by the Defendant after he was detained and remained with Officer Ballard. During the conversation between Officer Ballard and the Defendant, the Defendant contends the officers knew that the Defendant was not in possession of a weapon and that there is no evidence before the Court that shows that the officers asked the Defendant if he had a gun or if he had anything with him that could hurt them. Accordingly, the Defendant claims that the public safety exception cannot apply because the Court was not provided with any statements by either the officers or the Defendant.

At the hearing, the Government stated that its position is that a question regarding the location of the gun when the Defendant was taken down would have been proper when considering the officers' safety [Doc. 14 at 58]. However, the Court heard no proof that such a questioned was

24

asked. When questioned further by the Court, counsel for the Government stated that the Defendant's statements that "We were just shooting into the bank behind the trailer" and that it was "no big deal," as well as his commentary about his drug charges and felony convictions, are all of the statements that she has proof of, and she indicated that those are the only statements which the Government plans to use at trial. Later, the Government represented that the sum and substance of any statements made by the Defendant at the scene were what the Government intends to use at trial; however, the Government was unclear as to whether that included any possible statements referencing "Mike." Because the Government represented at the hearing that only statements made to Officer Ballard will be introduced at trial, and because Officer Ballard administered <u>Miranda</u> warnings to the Defendant prior to the point at which he made such statements, the Court does not find it necessary to reach the parties' arguments related to the public safety exception in this case.

The Sixth Circuit has previously addressed the necessity of administering <u>Miranda</u> warnings in <u>Terry</u> stop situations. In discussing custodial interrogation and cases cited by the parties before the court in <u>Salvo</u>, the Sixth Circuit wrote:

> The problem with this analysis is that because both of these cases were <u>Terry</u> stop situations, the question of whether the suspects were free to leave simply did not enter into the custody determination analysis. This is so because the transitory nature of a <u>Terry</u> stop itself indicates that a suspect is not free to leave during that brief period of detention. Thus, because of the very cursory and limited nature of a <u>Terry</u> stop, a suspect is not free to leave, yet is not entitled to full custody <u>Miranda</u> rights.

<u>Salvo</u>, 133 F.3d at 949. Additionally, in discussing whether a suspect was subject to custodial interrogation and thus entitled to <u>Miranda</u> warnings, the Sixth Circuit in <u>United States v. Swanson</u> wrote that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." 341 F.3d 524, 528-29 (6th Cir. 2003)

25

(internal citations omitted). Moreover, "[t]he very nature of a <u>Terry</u> stop means that the detained individual is not free to leave during the investigation, yet is not entitled to <u>Miranda</u> rights. <u>Id.</u> at 528 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439–41 (1984)). Accordingly, though the Defendant was not free to leave during the investigatory stop,[6] given the Court's findings with regard to the <u>Terry</u> stop in this case, the Court again finds that the restraint of the Defendant was not to the degree associated with a formal arrest.

The Court has already found that the encounter between Officer Ballard and the Defendant, during which he made the statements in question,[7] was an investigative stop rather than a formal arrest. Accordingly, based on the cases laid out above, the Defendant may not have been entitled to <u>Miranda</u> rights during his conversation with Officer Ballard. Nevertheless, the Court finds that the Government has met its burden with regard to the <u>Miranda</u> waiver in this case, by proving that it is more likely than not that the Defendant waived his <u>Miranda</u> rights prior to making the inculpatory statements which the Defendant wishes to have suppressed.

Officer Ballard testified that he advised the Defendant of his <u>Miranda</u> rights shortly after the Defendant was handcuffed and that the Defendant acknowledged those rights and then chose to

---

[6]The Court notes that both officers testified at the suppression hearing that the Defendant was in "custody" when he was ordered to the ground and handcuffed. Whether the officers stated that the Defendant was "in custody" is not conclusory on the subject of whether he was subject to custodial interrogation. For the reasons set forth herein, however, the Court need not address the issue of custodial interrogation here. Accordingly, those statements by the officers do not bear on the Court's findings with regard to the admissibility of the Defendant's statements.

[7]The Court notes that as stated above, despite questioning by the Court, it remained somewhat unclear at the hearing which specific statements the Government intends to introduce against the Defendant and which statements the Defendant specifically wishes to have suppressed. The Court's analysis is based on the Government's representation at the hearing that the statements in question are the Defendant's statements during his conversation with Officer Ballard prior to his formal arrest.

conduct a conversation with Officer Ballard. No evidence before the Court suggests that the testimony of Officer Ballard is not credible or that it should be dismissed. The Defendant contends that this testimony alone, combined with the testimony of Officer Crawford that he heard Officer Ballard advising the Defendant of his rights as he left to go investigate the surrounding area, is insufficient to meet the Government's burden of proving by a preponderance of the evidence that the Defendant knowingly and voluntarily waived his <u>Miranda</u> rights. The Defendant's argument seems to be primarily based on the inconsistency of the testimony of the two officers at the suppression hearing. While the Court notes that Officer Crawford's testimony had inconsistencies that cause some concern for the Court, the Court finds Officer Ballard to be credible and that any inconsistencies between his and Officer Crawford's testimony do not bear on the issues central to the Court's determination with regard to the conversation between Officer Ballard and the Defendant. The Court finds that the unrebutted testimony of Officer Ballard sufficient to prove that the Defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights before speaking with Officer Ballard.

In sum, the Court recommends that the statements at issue be deemed admissible for purposes of trial because they were made voluntarily after the Defendant was properly advised of his <u>Miranda</u> rights. Based on the Government's representations at the hearing, the Court observes that any statements made prior to the Defendant having been advised of his rights are not included in the statements the Government seeks to introduce at trial.

## V.  CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the Defendant's statements.  For the reasons set forth herein, it is **RECOMMENDED** that the Motion to Suppress Evidence and Memorandum in Support [**Doc. 9**] be **DENIED**.[8]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[8]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).